GENEVA CLAYTON et al., Plaintiffs, *v.* WILLIAM S. FARISH et al., Defendants.

Supreme Court, Special Term, New York County, August 29, 1947.

*Davis Polk Wardwell Sunderland & Kiendl* for E. J. Sadler and others, defendants.

*Hayes, Nottingham & Combs* for W. C. Teagle and another, defendants.

*Edward F. Johnson* for Standard Oil Co. (New Jersey) and others, defendants.

*McLaughlin & Stern* for plaintiffs.

HECHT, J. These stockholders' derivative actions, consolidated by order of Mr. Justice SCHREIBER (*Clayton* v. *Standard Oil Company*, 37 N. Y. S. 2d 259), are brought on behalf of Standard Oil Company (New Jersey) and certain of its wholly owned subsidiaries, who will hereinafter be collectively designated as " Standard ". Defendants are Standard, the individuals who were its directors when the acts complained of occurred, and I. G. Farbenindustrie Aktiengesellschaft (hereinafter called " I. G."), a German corporation. Judgment is demanded for $100,000,000 and directing the individual defendants and I. G. to account to Standard for all losses sustained by it as the result of their alleged wrongful acts, and for all profits alleged to have been made by them.

Defendants, other than I. G., have moved: (a) pursuant to subdivisions 2 and 5 of rule 106 of the Rules of Civil Practice for judgment dismissing all four causes of action upon the grounds (1) that this court is without jurisdiction of the subject matter thereof because predicated upon the Federal Antitrust Laws, and (2) that the complaint does not state facts sufficient to constitute a cause of action of which this court has jurisdiction; and (b) to the extent that the foregoing motion be denied, for summary judgment, pursuant to rules 113 and 114, dismissing upon the merits all of the second and third causes of action, and so much of the first cause of action as is based upon paragraph 23 thereof; and dismissing so much of each of the four causes of action as is predicated upon acts occurring more than three, six or ten years before the respective dates of service on the several defendants. The earliest date of service was April 3, 1942.

### The First Cause of Action.

The first cause of action is the most important, and is also the basis of the other three. It contains sixty-five lengthy allegations which will be summarized as briefly as is consistent with a determination of this motion, except for paragraph 23, which will be reserved for separate consideration and is to be

deemed excluded from any discussion therein. Reference to defendants will mean only the defendant directors, unless otherwise stated.

In stating these allegations, I accept them as true on the motion under rule 106, and am not concerned with whether there is any factual basis for them. If in any respect upon the facts stated the plaintiffs are entitled to a recovery, the motion must be denied (*Dyer* v. *Broadway Central Bank,* 252 N. Y. 430, 432-433).

It is alleged that prior to 1929 the oil industry, and particularly the business of Standard, had reached a point at which its patents, processes and field of endeavor coincided with developments in the chemical industry. If normal development had been followed, petroleum companies would be engaged in manufacturing chemicals out of petroleum and its by-products. Standard had many patents and processes for chemical products, which could be derived from petroleum; it had erected plants and laboratories, had employed chemists and engineers, had expended large sums in developing the aforesaid patents and processes "and had the facilities, resources, experience and personnel with which to engage in the aforesaid chemical business profitably." The manufacture of such chemical products from petroleum and petroleum derivatives would have produced large profits for Standard.

In 1927, I. G., which had certain patents for a hydrogenation process for producing gasoline and other fuels from coal, granted Standard certain rights to use such process, for a consideration paid by Standard. In 1929, while this hydrogenation agreement was still in effect, defendants entered into a conspiracy with I. G., pursuant to which defendants undertook to cause Standard to enter into agreements with I. G. to use their joint efforts, resources and influence to stifle competition and dominate and control the oil and chemical industries throughout the world.

In furtherance of such conspiracy the parties entered into a detailed agreement (hereinafter called the "cartel agreement") which is summarized in paragraph 19 of the complaint. In such cartel agreement the parties agreed generally to refrain from competition with each other in the manufacture and sale of oil and chemical products in the markets of the world (subd. 1); to acquire control of all patents and processes relating to synthetic rubber and relating to power point depressants, and to eliminate competition by other oil and chemical

companies in the manufacture and sale of such products throughout the world (subds. 6, 5).

In regard to oil, I. G. would transfer to Standard all of its present and future processes, both patented and unpatented, relating to the oil industry, solely for use throughout the world outside of Germany, and would not manufacture or sell oil products in any markets of the world outside of Germany (subds. 13, 11). The parties would acquire, for the benefit of I. G. in Germany and for Standard throughout the rest of the world, all patents and products for the manufacture of synthetic gasoline and other oil products (subd. 4). The parties would induce other refiners to transfer their patents, processes and know-how, present and future, to patent pools dominated by Standard in order that it might secure all new refining methods for itself throughout the world outside of Germany and for I. G. in Germany (subd. 3). Standard would secure for the use of I. G. in Germany the patents of refiners all over the world who entered into such patent pools, would sell in Germany oil products manufactured synthetically by I. G. by hydrogenation in preference to those produced from any source in the United States, and would generally give to I. G. the benefit of all its know-how in the oil and chemical fields (subd. 10).

In regard to chemicals, the parties agreed to refrain from manufacture and sale or other exploitation throughout the world (outside of Germany) of substantially all chemical products made from petroleum, coal, or natural gas as raw materials, except jointly with each other, and under the control of I. G. (subd. 2). Standard would endeavor to restrain third parties from competing with I. G. in the manufacture and sale of chemical products throughout the world (subd. 8), and would refrain from competing throughout the world in the manufacture and sale of chemical products with other chemical manufacturers bound to I. G. in cartel agreements (subd. 9). Standard would transfer to I. G. the control of the manufacture and sale throughout the world of all chemical products not closely related to the oil industry which Standard might develop at any time (subd. 7). I. G. would transfer to Standard the control of the manufacture and sale throughout the world (outside of Germany) of all chemical products which were closely related to the oil industry (subd. 12).

The conspiracy described above, in furtherance of which the cartel agreement was made, was designed to prevent Standard from developing the normal chemical business which flowed

directly from its oil business, which chemical business Standard was fully equipped to carry on and would have conducted but for such conspiracy. The conspiracy and the cartel agreements entered into pursuant thereto violated the Federal Antitrust Laws.

Between the years 1929 and 1942, in every instance where the interests of Standard came into conflict with those of I. G., defendants acted for the benefit of I. G. and against the interests of Standard. Standard was the owner of thousands of patents and processes for the manufacture of chemical products, and large profits could have been made from the manufacture of such products or from the licensing of such patents and processes to others. But, in pursuance of the conspiracy, defendants prevented Standard from utilizing or licensing such patents and processes and from manufacturing such products. The entering into of the conspiracy and the making of the cartel agreement was unlawful, no benefits flowed to Standard, and I. G. alone derived substantial benefit therefrom.

Four specific instances of these derelictions of duty by defendants are then alleged:

(1) Jasco was a corporation to which Standard and I. G. had transferred all their patents and processes relating to chemical products. Its stock and profits were divided in equal proportions between Standard and I. G. Jasco owned patents and processes for the manufacture of acetylene and synthetic acetic acid from petroleum, natural gas and petroleum gases. At a cost of several million dollars Standard and Jasco had erected plants which manufactured these products at a cost far below that of other producers. I. G. was also engaged in manufacturing these products, and the manufacture and sale thereof by Standard was detrimental to its interests. Thereupon defendants, yielding to I. G.'s persuasion, caused Standard to dismantle the plants and to abandon the manufacture and sale of acetylene and acetic acid, although they knew that there was a great demand for these products and that the plants would be operated at great profit.

(2) Jasco owned patents and processes known as "Buna-S" and "Buna-N", for the manufacture of synthetic rubber. Standard had perfected and patented its own processes for the manufacture of synthetic rubber called "Butyl", which is made from isobutylene, a common refinery by-product of petroleum. Butyl rubber was superior in many respects to natural rubber and could be purchased at lower cost. Standard had also developed an oil cracking process for the production of 100

octane aviation gasoline, which process also increased the production of isobutylene, and butadiene (a substance necessary in the Buna process). Standard had spent large sums in the development of both the Butyl and the Buna processes. The market for synthetic rubber was unlimited and large profits could be derived from its manufacture and sale or from licensing the processes. Nevertheless defendants, pursuant to the above described conspiracy, caused Standard to refuse to enter into licensing agreements requested by others, dissuaded the United States Government and others from undertaking such manufacture under license, and prevented Standard from proceeding with the manufacture or sale of synthetic rubber.

(3) Standard owned certain patents and processes for the manufacture of isopropyl other than for aviation gasoline. It transferred these to I. G. in exchange for the latter's patents and processes for the manufacture of methyl alcohol, which is used in anti-freeze solutions. This exchange was made because Standard was a large user of methyl alcohol, and because there was a great demand for this product. Standard intended to erect a plant for its manufacture and defendants knew that this venture could be carried on very profitably. I. G. had a cartel agreement with the duPont Company, which also manufactured and sold methyl alcohol and which would be adversely affected by Standard's competition, and therefore persuaded defendants to abandon the venture and to take no steps to manufacture or license others to manufacture methyl alcohol. Defendants yielded to this persuasion knowing of the business relationship between I. G. and duPont, and of the former's desire to obtain advantages for its own benefit and for duPont at the expense of Standard. Other losses are alleged to have resulted therefrom, in addition to the loss of profits.

(4) Standard owned the patents and processes for the "Methane Steam Process", which is used to manufacture hydrogen from natural gas. Hydrogen in turn could be used to make a variety of products. Many sought to have the use of this process and offered to pay Standard substantial royalties therefor. Defendants caused Standard to refuse these offers, yielding in that respect to the persuasion of I. G., despite their knowledge that the best interests of Standard required the licensing of such processes.

In addition to the loss of profits alleged generally, and in respect of the four specific processes just described, it is charged that Standard paid out over $35,000,000 to I. G. in the carrying out of the conspiracy and of the cartel agreement.

" All of the aforementioned acts were committed by the defendants pursuant to the aforesaid unlawful conspiracy and as a part of said conspiracy ". (Par. 59.) They continued until the United States Government obtained a decree adjudging the cartel agreement to be unlawful under the Federal Antitrust Laws. Such decree required that the patents and processes of Standard be made available to all persons for the duration of the war without payment of any royalties therefor. As a result, Standard will be deprived of substantial royalties which it would otherwise have received if the unlawful conspiracy had not been carried out.

### The Motion under Subdivision 2 of Rule 106.

The motion under subdivision 2 of rule 106 is predicated upon the following argument in defendants' brief: " The gravamen of the first cause of action is that the defendant directors caused Standard to enter into and carry out certain agreements which were unlawful under the Federal Anti-Trust Laws. That in pursuance of these unlawful agreements, Standard paid out certain sums of money and suffered the loss of profits which it might have made if it had not lived up to that portion of the basic agreement which allegedly bound Standard not to compete with I. G. in the chemical industry, and that the defendant directors are therefore personally liable for all payments made and losses allegedly sustained by Standard in adhering to and carrying out the terms of such unlawful agreements. A determination by this court that the agreements in question did, in fact, contravene the Federal Anti-Trust Laws is thus a condition precedent to the granting of the relief demanded."

I do not agree with this interpretation of the first cause of action. Even after eliminating from all paragraphs of the complaint the irrelevant allegations that the cartel agreement violated the Federal Antitrust Laws (*Kalmanash* v. *Smith*, 291 N. Y. 142, 157–158), the remaining allegations state a cause of action for wrongs done to Standard by defendants which would exist though no antitrust law had ever been enacted (*Abrams* v. *Allen*, 297 N. Y. 52).

In that case (decided after the argument of the instant motion), the Court of Appeals sustained the legal sufficiency of the complaint in a stockholder's derivative action brought on behalf of Remington Rand, Inc. The opinion of Desmond, J., is so pertinent to the case at bar that I will quote from it at some length (pp. 54–56): " The Appellate Division has dismissed this complaint on the ground that ' stripped of its conclusory allega-

tions ', it ' shows only a reasonable exercise of business judgment by the directors ' and that ' no facts are set forth which show that appellants [defendants] had interests adverse to the corporation or that they dealt with the corporation for their own benefit or that they were guilty of waste or fraud ' (271 App. Div. 326, 328). If in any aspect upon the facts stated plaintiffs are entitled to a recovery, dismissal was, of course, improper (*Dyer* v. *Broadway Central Bank,* 252 N. Y. 430, 432; *Condon* v. *Associated Hospital Service,* 287 N. Y. 411). We need examine only two paragraphs (8th and 19th) of this long complaint to find a sufficient statement of alleged facts which, if proven, to the satisfaction of a jury, may entitle plaintiffs to a verdict.

" Paragraph 8 of the complaint is as follows: * * * That quoted matter contains four plain and concise statements of material fact (Civ. Prac. Act, § 241). First, it is alleged that defendant directors caused the dismantling and removal of corporate plants and the intentional curtailment of production; second, that this caused great loss to the corporation on whose behalf this suit is brought; third, that these things were not done for any legitimate business reasons, but (fourth) were done solely to discourage, intimidate and punish the corporation's employees. Surely the allegations that plants were dismantled and that the damage was thereby caused, are typical allegations of fact. The same is true as to the recital of the motives with which these things were done (*Richmondville Union Seminary* v. *McDonald,* 34 N. Y. 379, 381; *People* v. *Lewis,* 275 N. Y. 33, 39; *Advance Music Corp.* v. *American Tobacco Co.,* 296 N. Y. 79, 85; 1 Wigmore on Evidence [3d ed.], § 119; 23 C. J. S., Criminal Law, p. 1127; *National Labor Relations Bd.* v. *Nevada Copper Co.,* 316 U. S. 105; *Matter of New York State Labor Relations Bd.* v. *Union Club,* 295 N. Y. 917).

" Paragraph 19 of the complaint charges: ' That notwithstanding the knowledge by the individual defendants of the matters set forth in paragraph " 8 " hereof, defendants permitted the defendant Rand, Jr. to dominate the board of directors of the defendant corporation in respect of its labor policies and acts as aforesaid and permitted him to vent his personal bias, animus and hatred in evolving and executing the policy, plan and program described in paragraphs " 7 " and " 8 " hereof, with the knowledge that the defendant Rand, Jr. was not actuated by honest bona fide considerations affecting the welfare of the defendant corporation and its stockholders but by the malice, bias and personal prejudices hereinbefore described

and that in so doing defendants abdicated their duties and responsibilities as directors of the defendant corporation and committed inexcusable and wanton breaches of their trust and violations of their duties as directors, to the injury of the defendant corporation.' Those allegations, like the ones quoted from paragraph 8, are plain, direct statements of fact.

" If the averments of fact, above quoted, are proven on the trial, they may be held to have amounted to actionable breaches of the duties owed by defendants to the corporation, as its trustees and agents. Depending on circumstances, they may fall into one or more of the categories of acts for which directors are liable in damages, among which are lack of due care (*O'Brien* v. *Fitzgerald,* 143 N. Y. 377; *General Rubber Co.* v. *Benedict,* 215 N. Y. 18; *Bosworth* v. *Allen,* 168 N. Y. 157; *Kavanaugh* v. *Commonwealth Trust Co.,* 223 N. Y. 103); waste or squandering of the corporate assets (*Bowers* v. *Male,* 186 N. Y. 28; *Hazard* v. *Wight,* 201 N. Y. 399); willful conversion or misapplication of the company's goods (*Brinckerhoff* v. *Bostwick,* 88 N. Y. 52, 62; *Quintal* v. *Kellner,* 264 N. Y. 32; *Pollitz* v. *Wabash R. R. Co.,* 207 N. Y. 113; see *Hornstein v. Paramount Pictures,* 292 N. Y. 468, 471); and using the corporation's property for the doing of an unlawful or immoral act (*Bath Gas Light Co.* v. *Claffy,* 151 N. Y. 24, 31; *Continental Securities Co.* v. *Belmont,* 206 N. Y. 7; *Berkey* v. *Third Avenue Railway Co.,* 244 N. Y. 84).''

" Whether, or how, these accusations may be proven is not our present concern. These defendants may not have done these things at all, or they may have done them for the best of reasons. But the complaint, which we are bound to take as true at this point, says the opposite. If we dismiss, we are saying that for such spoliation of a corporation, there is no redress. The case should be tried.''

Disregarding all the allegations about the illegality of the cartel agreement, the first cause of action herein alleges that in every instance where the interests of Standard came into conflict with those of I. G., defendants acted for the benefit of I. G. and against the interests of Standard; that in furtherance of this policy defendants caused Standard to relinquish profitable opportunities and wasted its assets in other ways; that these acts were done pursuant to an agreement from which no benefits flowed to Standard but from which I. G. alone derived substantial benefit.

These allegations are sufficient to charge defendants with failure to exercise due care in the administration of their trust.

" The defendant, as a director of a corporation, should have taken the same care of its property that men of average prudence take of their own property." (CARDOZO, J., in *General Rubber Co.* v. *Benedict*, 215 N. Y. 18, 23.) Directors are liable " if they suffer the corporate funds or property to be lost or wasted by gross negligence and inattention to the duties of their trust " (Chancellor WALWORTH, in *Robinson* v. *Smith*, 3 Paige Ch. 222, 231; repeated with approval in *Brinckerhoff* v. *Bostwick*, 88 N. Y. 52, 62, *supra*.) " The law requires of directors that they shall exercise in good faith that care which the problems confronting the corporation demand " (LEWIS, J., in *Blaustein* v. *Pan American Petroleum & Transport Co.*, 293 N. Y. 281, 304.)

The first cause of action also contains sufficient allegations to charge defendant directors with fraud. " When a fiduciary uses his power not for the benefit of the *cestui que trust,* whose interests alone he should protect, but uses it for his own personal advantage and profit or *for the advantage and profit of a third person,* that constitutes a fraud and such conduct is enough to charge him with a duty to account." .(McAVOY, J., in *Lonsdale* v. *Speyer*, 249 App. Div. 133, 142; italics supplied.)

Since the complaint alleges acts which this court has jurisdiction to redress, that jurisdiction is not destroyed merely because the pleader has improperly alleged in paragraph 59 that such acts were all committed pursuant to and as part of a conspiracy which violated the Federal Antitrust Laws, nor because the pleader consistently alleges that each of the acts, in addition to violating defendants' fiduciary duties as directors, also offends against the Federal Antitrust Laws. To the extent that relief is sought for such violation of the Federal statutes, the Federal courts have exclusive jurisdiction, but this court has jurisdiction to award reparation for damages resulting from the same acts insofar as they violate State laws (*Wise* v. *Tube Bending Machine Co.*, 194 N. Y. 272; *Underhill* v. *Schenck*, 238 N. Y. 7; *Condon* v. *Associated Hospital Service*, 287 N. Y. 411, *supra*).

In the *Wise* case (*supra*) the court overruled a demurrer on the ground that there was no jurisdiction of the subject of the action, saying (pp. 277-279) :

" It is elementary that the state courts have no jurisdiction of any matter which arises under the Federal Patent Laws, and the issue of which depends upon the construction or administration of those statutes. [Citing cases.]

" The converse of the proposition just stated is equally well settled. Whenever the rights of a plaintiff depend upon contract obligations which courts of general equity jurisdiction may

enforce, or for breach of which courts of common law cognizance may award damages, the mere fact that a patent is incidentally or collaterally related to the controversy, does not oust the state courts of jurisdiction. [Citing cases.]

" Counsel for the appellant invokes in aid of his pleading the rule of liberal construction established by the Code of Civil Procedure (section 519), and he disavows any intention to present any issue which involves the validity of patents or the application of patent laws. * * * If it was the pleader's real purpose to allege only that which he now asserts to be the gist of his cause of action he has been peculiarly unfortunate and extremely redundant. The extended historical chronology of the patents; the literal accuracy with which the devolution of the titles thereof seem to be traced; the iteration and reiteration of the plaintiff's ' exclusive rights ' in the use of the various ' patented machines ' described; * * * and the prayer for an injunction based upon the wrongful use by the defendants of the machines ' covered by said patents,' are all calculated to confuse rather than clarify the issues, if the action is not one for an infringement of rights protected by patents. Despite all these considerations the fact remains that *it cannot be asserted with dogmatic certainty that the complaint was framed solely upon the theory of an infringement of patent rights, and upon that issue we are disposed to give the pleader the benefit of the doubt.*" (Italics supplied.)

In *Underhill* v. *Schenck* (*supra*) the court affirmed a judgment directing defendant to account to plaintiff, saying, per CARDOZO, J., (p. 14) : " This fiduciary relation charged the fiduciary with a duty to refrain from forms of competition involving unfair diversion of royalties or profits. * * * This duty is quite apart from the duty of reparation that rests upon the infringer of a copyright. It would exist though no copyright law had ever been enacted. It has its origin, not in a right of property, but in a contract or relation. The author who suffers infringement of his copyright at the hands of a licensee, may count upon the infringement as a tort, and seek redress under the statute by action in the federal courts. But that is not in all circumstances the only remedy available. If the same act is not merely an invasion of the statutory right of property, but is also the breach of a contract or the abuse of a relation, he may count upon the breach or the abuse, and have relief accordingly. *When this is the ground of action, the courts of the state are not shorn of their competence.*" (Italics supplied.)

Similarly, in the case at bar, the duty of defendants to answer to Standard for the acts complained of " would exist though no (antitrust) law had ever been enacted." The right of the State to enforce that duty is recognized by the very authorities relied upon by defendants (*General Inv. Co.* v. *Lake Shore Ry.*, 260 U. S. 261; *Venner* v. *N. Y. C. & H. R. R. Co.*, 177 App. Div. 296, affd. 226 N. Y. 583).

Each of those suits was instituted by persons holding stock in both the Lake Shore & Michigan Southern Railway and the New York Central & Hudson River Railroad, to enjoin a proposed consolidation of the roads. It was alleged in each case that the consolidation violated both the Federal Antitrust Laws and the laws of various States in which the constituent railroads had been incorporated.

In *General Inv. Co.* v. *Lake Shore Ry.* (*supra*), the court said, per VAN DEVANTER, J., at pp. 287–8:

" This suit was brought in a state court, and, in so far as its purpose was to enjoin a violation of the Sherman Anti-Trust Act that court could not entertain it. The situation was the same in respect of the purpose to enjoin a violation of the Clayton Act.

" When a cause is removed from a state court into a federal court the latter takes it as it stood in the former. A want of jurisdiction in the state court is not cured by the removal, but may be asserted after it is consummated."

In respect of the alleged violation of State laws, the dismissal was affirmed, *not because of any lack of jurisdiction in the State court,* but solely because these allegations were merely conclusory and, therefore, insufficient to set forth a cause of action. (*American Locomotive* v. *Harris,* 239 F. 235, 239. Cf. *Kalmanash* v. *Smith,* 291 N. Y. 142, 153–154, *supra.*) In affirming the Supreme Court said (pp. 288–289): " This branch of the suit was loosely set forth and, as was observed by both courts below, there is some ground for thinking the references to state constitutions and laws were merely makeweights. With other matters eliminated, this branch at best was left in a state of relative uncertainty. After commenting on this, the Circuit Court of Appeals said, with ample warrant (269 Fed. 239): ' * * * Under such circumstances, the court of equity will be strict in requiring the plaintiff to point out with precision and certainty in what respects the law is about to be violated and to show, clearly and positively, substantial and irreparable injury to its private rights. A measure of imperfection in pleading that might well be overlooked in the ordinary controversy should not be disregarded in such a case as this.'

"We think this branch of the suit should be tested by the rule of pleading there suggested and that when this is done it is apparent that a right to equitable relief was not shown."

In the *Venner* case (*supra*), the complaint had been dismissed after a trial on the merits. The Appellate Division affirmed on the merits. However, it pointed out specifically that the State court had no jurisdiction to enforce the Federal Antitrust Laws (177 App. Div. 326–329). In respect of the alleged violation of State laws, on the other hand, there was no statement of any lack of jurisdiction in the State court, the affirmance was exclusively on the merits (pp. 329–346, 349–351).

Since in both of the foregoing cases, after expressly holding that the State courts had no jurisdiction over the portion of the suit predicated upon the Federal Antitrust Laws, the court went on to consider the portion based upon State law on the merits exclusively, I take them to be square holdings that the State courts have jurisdiction over such suits. This proposition was expressly stated in *Meyer* v. *Kansas City Southern Ry. Co.* (84 F. 2d 411, certiorari denied 299 U. S. 607).

That was a stockholders' derivative action brought on behalf of the St. Louis Southwestern Railway against its directors and others. The complaint charged the defendants with engaging in a conspiracy to violate the Sherman and Clayton Acts in the execution of which they illegally acquired control of St. Louis Southwestern, and by reason of such controlling position, diverted traffic from it, impaired its valuable traffic relations with other roads, operated its lines inefficiently and wasted its funds. The prayer for relief sought damages for the losses thus sustained and an accounting of the profits realized by the conspirators. The action was instituted in the Federal court upon the ground that it involved the construction and interpretation of the Sherman and Clayton Acts. In affirming a dismissal on motion for want of subject-matter jurisdiction, the court said (p. 414):

"But so far as the appellees are liable for a breach of the fiduciary duties to minority stockholders imposed upon them by reason of their control of the St. Louis Southwestern, it is immaterial that their breaches of faith to the appellant also involved violations of federal statutes. *The appellees' liability would be complete though their acts were not public offenses and a determination of federal law is thus not necessarily involved* * * *.

" * * * In both the Hand Case [*Hand* v. *Kansas City Southern R. Co.*, 55 F. (2d) 712] and the Guiterman Case [*Guiter-*

man v. *Pennsylvania R. Co.*, 48 F. (2d) 851] suit was originally brought in a state court against a railway and its directors by a stockholder for an accounting by the directors of the company for breaches of their trust based on acts damaging the corporation and violating the anti-trust laws. * * * So far as they stand for the proposition that an allegation that a defendant violated a federal statute is sufficient to bring a case within federal jurisdiction, although the fact that a statute was violated is immaterial to the plaintiff's cause of action, we must decline to follow them. *So far as the cases decided that a state court of equity had power to redress a waste of the assets of a corporation by its directors, we think the decisions were rightly reached.''* (Italics supplied.)

Since the Federal court would refuse jurisdiction herein because defendants' liability to Standard would be complete even though their acts were not public offenses, it would be a miscarriage of justice for this court to disclaim jurisdiction of such complete liability because the pleader has improperly added the irrelevant allegations that the same acts were also public offenses. In *Kalmanash* v. *Smith* (291 N. Y. 142, 157–158, *supra*), the court granted a motion under rule 103 to strike out a paragraph in the first cause of action alleging that the corporation had been damaged by an act of its directors and a competitor which violated the Clayton Act. But the court did not disturb the remaining paragraphs of that cause of action, which were substantially similar to the allegations herein charging a conspiracy pursuant to which the directors sacrificed the interests of the corporation for the benefit of the competitor (see Record on Appeal, fols. 91–160).

It follows from the foregoing that the losses claimed in paragraph 59 are a proper element of damage in this action. That paragraph alleges that defendants' acts violated the Federal Antitrust Laws; that as a result of such violation, the United States Government obtained a decree requiring that Standard's patents and processes be made available to all persons for the duration of the war without payment of any royalties therefore, thus depriving Standard of substantial royalties which it would otherwise have received if the unlawful conspiracy in restraint of trade had not been carried out.

As previously stated, liability cannot be imposed on defendants by this court merely because they violated the Federal Antitrust Laws. The basis of their liability here must be acts which fail to conform to their fiduciary duty to Standard as described in *Abrams* v. *Allen* (297 N. Y. 52, *supra*). *But once liability*

*has been established on that basis, the measure of damage is the entire loss sustained by Standard,* which should include all damages or penalties paid by Standard to others as the result of the self-same unlawful acts.

If defendants avoided competing with I. G. because they wished to serve its interests in preference to those of Standard, that is a wrongful act for the consequences of which they must answer to the corporation. If that wrongful act has the additional vice of violating the Federal Antitrust Laws as the result of which Standard is required to forfeit its rights to royalties which could otherwise be collected or to pay damages or fines, those losses to Standard are the direct result of defendants' acts which this court may redress. Any other conclusion would leave Standard remediless for these losses caused by defendants' wrongful acts, since no relief therefor could be obtained in the Federal courts. (*Meyer* v. *Kansas City Southern Railway Co., supra.*) Of course, at the trial plaintiffs will have to establish that this penalty in the antitrust decree was imposed because of those acts of defendants which violated our law covering the duties of directors, and not because of acts which violated only the Federal Antitrust Law.

The motion to dismiss the first cause of action, pursuant to subdivision 2 of rule 106 is denied.

### The Motion under Subdivision 5 of Rule 106.

The motion under subdivision 5 of rule 106 is based upon the following argument in defendants' brief: " Absent the claim of illegality under the Federal Anti-Trust Laws, the cartel agreement constituted merely a business arrangement of very great magnitude and scope, under which, in essence, I. G. and Standard would pool their respective patents and processes, I. G. to refrain from competing with Standard in the oil field and Standard to refrain from competing with I. G. in the chemical field. While, on the face of the alleged agreement, Standard would suffer the detriment of foregoing possible profits through development and expansion in the chemical field, Standard, on the face of the alleged agreement, would at the same time receive, among other things, a transfer of the I. G. oil patents and processes and enjoy the benefit of freedom from competition by I. G. in the oil field * * *. Absent the claim of illegality under the Federal Anti-trust Laws, the action of the defendant directors in causing Standard to enter into and carry out the cartel agreement was a matter purely of business judgment, not subject to attacks by dissenting stockholders or to judicial review."

Here again I do not agree with defendants' interpretation of the complaint. The mere fact that the acts complained of were part of the business arrangement of very great magnitude and scope and that Standard received some consideration for what it gave up, does not *ipso facto* bring the " business judgment " rule into play. Here the complaint alleges that in respect of the very agreement which specifies the consideration on both sides, no benefits flowed to Standard and I. G. alone derived substantial benefit therefrom. Conceding that " the fairness of the transaction must be measured not by hindsight but in the light of the circumstances which presented themselves at the time of the transaction " (*Turner* v. *American Metal Co.*, 268 App. Div. 239, 251), the foregoing allegations are sufficient to state a cause of action which satisfies the " business judgment " rule. " When courts say that they will not interfere in matters of business judgment; it is presupposed that judgment — reasonable diligence — has in fact been exercised. A director cannot close his eyes to what is going on about him in the conduct of the business of the corporation and have it said that he is exercising business judgment " (SHIENTAG, J., in *Casey* v. *Woodruff*, 49 N. Y. S. 2d 625, 643).

Even more important, the complaint specifically alleges (par. 25) that in every instance where the interests of Standard came into conflict with those of I. G., defendants acted for the benefit of I. G. and against the interests of Standard. In the four specific instances of acetylene, synthetic rubber, methyl alcohol and the methane steam process, it is again alleged that the defendants relinquished profitable opportunities for Standard at the instigation and for the benefit of I. G. These allegations are clearly sufficient to state a cause of action under the " business judgment " rule. " The test in each case is whether corporate action is the result of the exercise by the directors of their *unbiased judgment in determining that such action will promote the corporate interests* " (LEHMAN, Ch. J., in *Chelrob Inc.*, v. *Barrett*, 293 N. Y. 442, 460; italics supplied). " The internal affairs, questions of policy of management, and expediency of contracts of a corporation are subject to the control of a board of directors, *and insofar as those directors are honest, capable and independent, their judgment is final.*" (COHN, J., in *Turner* v. *American Metal Co.*, 268 App. Div. 239, 259; italics supplied.)

In *Abrams* v. *Allen* (297 N. Y. 52, *supra*), the Appellate Division had dismissed the complaint on the ground that " stripped of its conclusory statements ", it " shows only a reasonable

exercise of business judgment by defendants " and that " no facts are set forth which show that the appellants [defendants] had interests adverse to the corporation or that they dealt with the corporation for their own benefit or that they were guilty of waste or fraud." (271 App. Div. 236, 328.) The Court of Appeals reversed, holding that the case should be tried. This, it seems to me, applies with even more force to the case at bar, where the allegations are more strongly indicative of derelictions of duty. In all the cases cited where the directors were exonerated under the " business judgment " rule, the complaints were dismissed on the merits after lengthy trials.

Thus, in *Blaustein* v. *Pan American Petroleum & Transport Co.* (293 N. Y. 281, *supra*), stockholders of Pan American (called " Pan-Am ") charged that Standard Oil Company of Indiana (called " Indiana "), which owned a majority of its stock, had appropriated Pan-Am's opportunities to develop crude oil resources and pipe lines transportation in order to furnish such oil and transportation itself at unreasonable prices. The court said (pp. 302–303) : " We find no evidence which justifies the conclusion that Indiana so dominated the affairs of Pan-Am and the official acts of the defendant directors as to impair the free exercise of honest, independent judgment by those directors. In those matters which related to crude oil production, to which reference has been made, and in meeting the difficult problems of crude oil purchasing and pipe line transportation which faced the Board of Directors of Pan-Am in 1933, the arrangements made were in the exercise by the defendant directors of honest business judgment. There was no finding of fraud or bad faith on the part of the defendant directors in any of the transactions with which Special Term dealt. * * * ' We find no evidence that the contracts made for crude oil purchasing and pipe line transportation were unreasonable in price; nor is there evidence that under conditions then existing — when large capital expenditures were of doubtful expediency — the arrangements made to purchase crude oil and to transport it were not for the best interests of Pan-Am. ' "

In *Chelrob, Inc.* v. *Barrett* (293 N. Y. 442, *supra*) stockholders of Queens Borough Gas & Electric Company charged that it had sold gas to its subsidiary Nassau & Suffolk Lighting Co., at inadequate prices fixed for its own interest by Long Island Lighting Co., a stockholder in Queens. The court said (p. 460) : " The directors of Queens intended to exercise an unbiased judgment and in good faith believed that the price fixed by them was fair. Their good faith is established by persuasive evidence

and by the findings of the trial court approved by the Appellate Division. So, too, is the fact that the price was fixed after the directors had considered and discussed reports, in regard to the price at which gas should be sold, made by competent engineers and operating experts."

In *Turner* v. *American Metal Co.* (268 App. Div. 239, *supra*), stockholders of American Metal Co., charged that defendant directors (1) took for themselves 90% of the interest of American Metal in a molybdenum enterprise called "Climax Molybdenum Company, and (2) in cooperation with Climax, they caused American to put its facilities and resources at the disposal of Climax for the benefit of the latter and of defendant directors ". The court said (pp. 251, 272–273):

" Those experienced in mining enterprises who regarded the molybdenum venture as risky and speculative were apparently justified in their conclusion, for the ore which had been counted on at the time of the purchase of Climax, was exhausted in 1926. Only through the discovery of new ore on properties not acquired until 1925 was the enterprise saved from closing in 1926 with a net loss of well over a million dollars. Accordingly, Climax could not, as plaintiffs assert, be regarded in the year 1917 as an enterprise of assured success."

" The decision of the directors of American Metal to render such assistance to Climax as it did, was fully justified. Climax made no profits ' at the expense ' of American Metal and the success of the former, far from being a detriment to American Metal, resulted in a net profit to American Metal of more than $16,000,000. Upon an examination of all the evidence, we hold that Climax amply compensated American Metal for the use of its resources, facilities and services from December, 1928, up to the time of trial, and that such reciprocal services which were rendered and not paid for were hardly of a character that should be regarded as compensable."

*Everett* v. *Phillips* (288 N. Y. 227) was an action brought on behalf of Empire Power Corporation, alleging that its directors had improperly loaned its funds to Long Island Lighting Co. The Appellate Division (261 App. Div. 1082) reversed on the law and the facts a judgment for plaintiff and directed, upon new findings, a dismissal of the complaint upon the law. In affirming, the court said (p. 236): " There may be difference of opinion as to whether these defendants as directors of Empire Power Corporation acted wisely in the handling of the loans. There are many matters disclosed by the record which cast doubt upon the prudence, the wisdom, and the concern for the public interest

shown by these directors. We are constrained, however, to agree with the Appellate Division that there is little, if any, evidence to sustain a finding that they have violated their trust or have failed to protect the interests of the Empire Power Corporation according to the dictates of their judgment, be that judgment good or bad.''

In *Marony* v. *Applegate* (266 App. Div. 412, 422), the trial court expressly found no conflict or bad faith but determined that in allocating joint expenses among related companies, '' the directors did not prorate them as the circumstances required, based on what the court considered an equitable appropriation thereof.'' The Appellate Division reversed and dismissed on the merits because, considering all the elements in the case, it concluded that the ''business judgment'' rule should control.

In *Bayer* v. *Beran* (49 N. Y. S. 2d 2) the court dismissed the complaint after finding that '' on the entire case the directors acted in the free exercise of their honest business judgment and their conduct in the transactions challenged did not constitute negligence, waste or improvidence '' (p. 15). A similar result was reached in *Casey* v. *Woodruff* (49 N. Y. S. 2d 625, 642–643) because the court found that the directors had arrived '' at a decision for which there is a reasonable basis '' and that they had acted '' in good faith as the result of their independent judgment, and uninfluenced by any consideration other than what they honestly believed to be for the best interests of the railroad.''

The motion to dismiss the first cause of action, pursuant to subdivision 5 of rule 106, is denied. In view of the nature of the allegations it may be well to repeat the concluding paragraph of *Abrams* v. *Allen* (297 N. Y. 52, 56, *supra*): '' Whether, or how, these allegations may be proven is not our present concern. These defendants may not have done these things at all, or they may have done them for the best of reasons. But the complaint, which we are bound to take as true at this point, says the opposite. If we dismiss, we are saying that for such spoliation of a corporation there is no redress. The case should be tried.'?

### The Statute of Limitations.

The first cause of action sets forth a claim for injury to the property of Standard and, therefore, is governed by subdivision 7 of section 49 of the Civil Practice Act, even though some uncertainty exists as to the exact amount of the damages, since no facts are set forth showing the inadequacy of the legal remedy

against the defendant directors, the only movants. (*Corash* v. *Texas Co.*, 264 App. Div. 292, 297.) This statute imposes a three-year limitation except that acts occurring prior to its amendment on September 1, 1936, are governed by the six-year limitation formerly found in subdivision 3 of section 48 of the Civil Practice Act. (*Pollack* v. *Warner Bros. Pictures, Inc.*, 266 App. Div. 118, 120.)

"The Statute begins to run from the date of the commission of each separate wrongful act alleged in each cause of action regardless of the date of the discovery or of the continuance in control by appellants." (*Pollack* v. *Warner Bros. Pictures, Inc., supra*, p. 120; see, also, *Mencher* v. *Richards*, 283 N. Y. 176, 181-183.) Since the earliest date of service was April 3, 1942, the statute denies recovery for all acts prior to April 3, 1939, except for those occurring between April 3, and September 1, 1936. Portions of the first cause of action may be dismissed if the allegations as to distinct transactions occurring prior to April 3, 1939, are readily separable. (*Myer* v. *Myer*, 271 App. Div. 465, 476; *Gottfried* v. *Gottfried*, 269 App. Div. 413, 416.) The difficulty with applying this principle to the complaint in this case is that the first cause of action is vague as to the dates when the various acts complained of occurred.

The cartel agreement was made in 1929 (par. 19); any recovery predicated upon the cartel agreement or upon so much of the conspiracy as was consummated by the cartel agreement, is barred by the statute. But the dates of other acts of commission and omission are not specified, and they cannot be dismissed on motion merely because it is alleged that they were done pursuant to the conspiracy or to cartel agreement.

In *Corash* v. *Texas Co.* (*supra*), the wrongful act charged was an agreement transferring the properties of Indian Company to Texas Corporation in exchange for the latter's promise to pay annual royalties. It was alleged that the properties were worth far more than the agreed consideration. The wrongful act was completed when the properties were transferred and the court, therefore, held that the statute began to run on that date (p. 295); it could not be said that the wrong was a continuous one "simply because consequential damages mounted during the passage of time after the particular act complained of" (SCHREIBER, J., in *Hayman* v. *Morris*, 46 N. Y. S. 2d 482, 491). In the subsequent case of *Austin* v. *Gardiner* (267 App. Div. 863), an action brought on behalf of a subsidiary against a parent corporation, the complaint alleged

that the parent was continuing to exact payment from the subsidiary of unfair charges imposed by a freight contract between them, and was continuing to siphon moneys from the subsidiary through a management contract between them (Record on Appeal, fols. 86–90). The freight contract was made prior to July 1, 1931, and the management contract on August 31, 1931; (ibid) the earliest date of service was July 16, 1942 (fols. 50–51). The court denied a motion to dismiss, saying (pp. 863–864): " However, since the management and freight contracts seem to be continuing agreements and since the other claims may or may not have occurred within three years of the bringing of this suit, we think that the extent to which the Statute of Limitations is a partial bar should be left to the trier of the facts to determine."

In the instant complaint, the paragraphs charging defendants with failure properly to develop and exploit synthetic rubber (pars. 35–48), methyl alcohol (pars. 49–52), the methane steam process (pars. 53–54) and the thousands of other patents and processes owned by Standard (par. 55) allege continuing injuries, and the Statute of Limitations is, therefore, no defense except that recovery will be limited to damages accruing since April 3, 1939, and during the period 'from April 3, to September 1, 1936 (*Colrick* v. *Swinburne,* 105 N. Y. 503, 507–508; *Arnold* v. *The Hudson River Railroad Co.,* 55 N. Y. 661, 662; *Hunt* v. *Hunt,* 152 Misc. 364, 365–366, affd. 242 App. Div. 721). " Any other conclusion would lead to the intolerable result that after the passage of the statutory period, there would exist no remedy to compel the cessation of such a situation, readily distinguishable from consequential damages from a single act " (*Hayman* v. *Morris, supra,* p. 493).

The motion is, therefore, denied as to paragraphs 35 to 55 inclusive.

Though, as indicated above, recovery is barred in respect of the making of the cartel agreement, the motion to strike out paragraphs 19, 20, and 21 must be denied since plaintiffs may " set forth relevant facts by way of inducement or historical background tending to show the existence of continuing wrongs, and, in so doing, could go back to a period before the stock was acquired by him. Otherwise, it might be impossible to recover for any continuing wrong." (*Austin* v. *Gardner,* 188 Misc. 538, 539.)

In regard to acetylene, the wrong was completed when defendants caused Standard to dismantle its manufacturing plant and to abandon further production, but the complaint alleges that

this was done in September, 1939 (par. 33) so that this claim is not barred. However, recovery under the allegations of paragraph 32 would be limited to damages accruing since April 3, 1939, and during the period from April 3, to September 1, 1936.

As to the payments aggregating $35,000,000 improperly made by Standard to I. G. (par. 55), the statute begins to run from the date of each payment even though made pursuant to a continuing conspiracy.

As to the losses caused by the forfeiture of royalty rights resulting from the antitrust decree (par. 59), the trial court will have to determine whether such decree resulted from acts barred by the statute. If so, no such damage could be allowed because the basis for liability would be lacking.

### Paragraph 23 of the Complaint.

The second allegation of this paragraph is that defendant Teagle, one of the three defendants who dominated Standard's board of directors, received from American I. G. Chemical Corporation (a subsidiary of I. G.) 500,000 shares of its class B stock for the personal benefit of himself and of the individual defendants who were then officers and directors of Standard. The motions under rule 106 are denied as to this allegation.

Defendants have moved for summary judgment on the merits, pursuant to rule 114, which they may do even though the claim is not stated as a separate cause of action. (See *Gans* v. *Hearst,* 173 Misc. 663, 665, affd. 259 App. Div. 861.) On this motion defendants offer letters, telegrams, and interoffice memoranda designed to show that Teagle permitted the stock to be issued to him as holder of record only temporarily as an accommodation to a foreign company connected with I. G., which was the true beneficial owner; that, immediately upon receipt of the stock certificate, Teagle turned it over to the foreign company's attorney; that he never received or claimed any dividends or any other beneficial interest in the stock; and that record title to the stock had subsequently passed to someone else. The papers tendered are obviously incompetent for the purpose offered, and would not be admissible even upon the trial. The motion for summary judgment on the merits is denied.

Defendants have also moved for summary judgment based on the Statute of Limitations. The limitation applicable to recovery by Standard of the value of the stock, or of any dividends thereon, is the six-year period for money had and received (*Gottfried* v. *Gottfried,* 269 App. Div. 413, *supra*). That motion must be denied on the present papers inasmuch as paragraph

23 does not specify any dates. This is without prejudice to a renewal on the basis of documentary evidence establishing (1) that the certificate of stock was delivered to Teagle prior to April 1, 1936; and (2) that record title was transferred out of his name prior to that date, or that the stock never paid any dividends.

The first allegation of paragraph 23 is that defendants caused Standard to issue 125,000 shares of its stock to I. G. without any consideration therefor, and to sell 200,000 shares of such stock to I. G. at $50 per share, though the market price thereof was $72 a share. The motions under rule 106 are denied.

The motion for summary judgment on the merits is based upon findings of fact made by the United States District Court in an action brought by Standard against Markham, as Alien Property Custodian (64 F. Supp. 656). Such findings of fact are not documentary evidence of the facts found. The judgment of the District Court, though *res judicata* between Standard's stockholders and the Alien Property Custodian, is not *res judicata* between Standard's stockholders and its directors. The motion is denied.

The findings of fact state that the stock of Standard was transferred to I. G. in 1929. If defendants can establish that fact by documentary evidence, the three-year Statute of Limitations would be a bar as to defendant directors. The present motion under the Statute of Limitations is denied, without prejudice to a renewal.

### Remaining Causes of Action.

The second cause of action alleges that after the war in Europe began, defendants arranged with I. G. for a pretended sale of certain of the latter's holdings to Standard, pursuant to which the latter paid I. G. $190,000 for its stock in Jasco and $20,000 for its stock in Catalytic. The stock was never delivered to Standard but was transferred to trustees who held it on secret trust for I. G. with Standard's approval. The motions under rule 106 are denied. The motion based on the Statute of Limitations is denied, since the complaint alleges that the money was paid out after the war in Europe began, which was subsequent to April 3, 1939.

The motion for summary judgment on the merits is based upon the findings of fact in *Standard Oil Co.* v. *Markham* (*supra*). For the reasons indicated it is denied as to the Jasco stock, without prejudice to a renewal if defendants can offer documentary evidence to establish the findings. As to the

Catalytic stock, however, the findings are that Standard had acquired valid title thereto from I. G. Since this finding is *res judicata* against I. G., in whose right the Alien Property Custodian was acting, it conclusively establishes that Standard suffered no loss in the transaction, inasmuch as the complaint is not that the price paid was excessive, but that Standard never received the purchased stock. The motion for summary judgment cannot be granted at this time because the Alien Property Custodian has appealed from the judgment, but it may be renewed after affirmance of the foregoing findings or upon proof that it is not included in his appeal.

The third cause of action alleges that, although I. G. ceased to be a stockholder of Jasco and Catalytic after September 25, 1939, and was no longer entitled to share in their profits, defendants caused these companies to pay 50% of Jasco's profits and 20% of Catalytic's profits to I. G., which payments were made indirectly and fraudulently. The motions under rule 106 and the motion based on the Statute of Limitations are denied. The motion for summary judgment on the merits is also denied. The book entries tendered by defendants do not qualify as documentary evidence under the shop-book rule when the charge is that the payments are made in a fraudulent manner.

The fourth cause of action alleges that defendant corporations pleaded guilty to violating the Federal Antitrust Acts as a result of which Standard and its subsidiaries paid fines aggregating $35,000. This cause of action is governed by the observations in regard to paragraph 59 of the first cause of action and is disposed of accordingly. The motions under rule 106 and under the Statute of Limitations are denied, with the proviso that the statute will be a complete defense if it appears at the trial that the antitrust information was based upon acts barred by it.

Settle order in accordance with the foregoing.