WILSHIRE OIL COMPANY OF TEXAS, Appellant,

v.

L. E. RIFFE, R. L. Felts, O. Homer Riffe, A. V. Murray, and A. V. Murray, Inc., Appellees.

No. 8536.

United States Court of Appeals
Tenth Circuit.

Jan. 5, 1967.

Rehearing Denied March 24, 1967.

Certiorari Denied Oct. 9, 1967.

See 88 S.Ct. 50.

Richard H. Shaw, Denver, Colo. (Rodney O. McWhinney, Modesitt & Shaw, Denver, Colo., and Robert J. Woolsey, of Farmer, Woolsey, Flippo & Bailey, Tulsa, Okl., of counsel, with him on the Brief), for appellant.

David M. Thornton, Tulsa, Okl. (Gerald G. Stamper, Tulsa, Okl., with him on the Brief), for appellees.

Before PICKETT and SETH, Circuit Judges, and CHRISTENSEN, District Judge.

SETH, Circuit Judge.

This action was commenced by the appellant, Wilshire Oil Company of Texas, against certain of its former employees and a third party. The action sought damages, the recovery of compensation paid to the employees, and for an accounting of profits they allegedly made. The complaint asserted that the former employees engaged in activities which were contrary to their employment contracts and their fiduciary obligations to the company. It also asserts that the third party assisted the other defendants in their activities and was likewise liable.

The trial was had before the United States District Court for the Northern District of Oklahoma, and relief was denied. Appellant Wilshire has taken this appeal, asserting that certain findings of the trial court were not supported by the evidence and that there were errors of law.

The record shows that Wilshire obtained through a merger a company which had theretofore been owned principally by L. E. Riffe. This corporation, following the merger, became a division of Wilshire, but its officers and management continued very much as theretofore. L. E. Riffe became executive vice president of Wilshire and a director. He was in charge of the new division of Wilshire Oil Company which was known as the Riffe Division. Mr. Riffe was employed under a written contract of employment by which he agreed to devote his full business time to the performance of his duties as an employee and officer of Wilshire, and he further agreed that he would not invest in, be employed by, or work for any other firm or corporation "competitive with the Riffe Division." The contract further provided that investment in the stock of a competitor would constitute a breach of the contract. Such a "competitor" was defined to include any firm or corporation engaged in "purchasing and/or selling and/or producing asphaltic materials in any of the areas in which the Riffe Petroleum Company was engaged in purchase and/or sale and/or producing asphaltic materials."

The record shows that the Riffe Division purchased asphalt from various oil refineries in Oklahoma and in Kansas and sold the product in Oklahoma and other nearby states.

At the end of 1961 L. E. Riffe negotiated and signed on behalf of Wilshire Oil Company a contract with Cities Service Petroleum Company for the construction of an asphalt plant. The agreement also provided that Cities Service would furnish raw materials, and Wilshire would sell the products. Wilshire thereafter decided not to proceed with the construction of the plant and directed Mr. Riffe to terminate the agreement. Mr. Riffe then advised several business men of the possibility of constructing the plant, and this group organized the Redstone Asphalt and Petroleum Company. A. V. Murray, a friend of Mr. Riffe, was one of this group, and he purchased sixty per cent of the corporate stock. Redstone thereafter negotiated further with Cities Service, and in June 1962 entered into a new agreement for building the plant and sale of its output. Wilshire was thereby released from its contract with Cities Service. With the Redstone contract Mr. Riffe guaranteed that Redstone would perform for Cities Service, and he also guaranteed a portion of a bank loan made to Redstone.

In May 1962 Mr. Riffe signed an affidavit for Wilshire which purported to set out what his relationship with Redstone was and would be. In this affidavit he stated that his only interest in the Redstone-Cities Service contract would be as a guarantor. He further stated that he was not a stockholder of Redstone nor had any arrangements whereby he would receive any profits which Redstone might receive under its contract with Cities Service. In this affidavit he further stated his only interest in Redstone "monetarily or otherwise, is as a guarantor of Redstone's contract with Cities Service and its loan secured for the construction and equipment of an asphalt plant * * *." He further

stated in the affidavit that he would not do anything nor permit anything to be done by reason of his guarantee of Redstone's obligations which would "jeopardize, interfere, or restrict in any manner whatsoever, his duties to Riffe Petroleum Company, a division of Wilshire, and that he shall continue to faithfully and diligently perform such duties required of him as an officer, director and stockholder of Wilshire."

The plant construction by Redstone was delayed and meanwhile it purchased asphalt for sale to its customers from Wilshire at a reduced price. It was apparent that Redstone was intended to be a competitor of Wilshire and would become such competitor when it first commenced the sale of asphalt to its customers.

At the end of May 1962 Mr. Riffe and his wife executed six trust instruments, creating separate trusts for each of their young daughters. The two trustees at the time the trusts commenced were O. Homer Riffe who was a brother of Mr. Riffe, and the other was an attorney of Mr. Riffe. The trust instruments recited that Mr. Riffe and his wife thereby transferred to the trusts the properties which were listed on schedule A attached to the trust. This first schedule was apparently prepared about the time the trusts were created. On this schedule are listed, for each of the six trusts, 150 shares of Redstone stock; an undivided interest in a note of Universal Asphalt Company, which is also in issue here; an interest in a commission contract between A. V. Murray and the corporation which constructed the asphalt plant, in issue in this case; and in addition, oil and gas leaseholds, royalties, and other interests.

The six trusts according to the schedules attached to each thus held in May 1962 thirty per cent of the total issued and outstanding stock of Redstone. The record also shows that Wilshire had no knowledge of the fact that these stocks were in the family trusts of Mr. Riffe.

The record is not entirely clear as to why these shares of Redstone were transferred to the trusts, but it shows that they were transferred by Mr. A. V. Murray from the shares he held in Redstone The court found that in July 1962 Mr. Murray attempted to sell one-half of his stock of Redstone to Mr. Riffe at a price equivalent to Mr. Murray's cost. The court found also that Mr. Riffe rejected this offer and informed Mr. Murray that his employment contract with Wilshire prohibited him from owning such stock. The court further found that Mr. Murray thereafter, "voluntarily and without demand by L. E. Riffe, * * *" transferred the stock to the six trusts for the Riffe daughters and likewise assigned one-half of his interest in the commission for the construction of the Redstone plant. The court found that the transfer of stock was not in accordance with any previous arrangement between the parties, and that Mr. Murray made the transfers " * * to express his appreciation to L. E. Riffe for affording A. V. Murray an opportunity to invest in Redstone * * *." The trust schedule relating to the Redstone stock contained a recitation that the transfer was "subject to payment of $9,000.00 to A. V. Murray for costs of stock." In connection with the transfer of this stock to the trust, Mr. Murray dealt with the attorney for the bank which about a year later became a trustee, and he negotiated the transfer with this person.

The record shows that from the time after Redstone contracted with Cities Service, Mr. Riffe participated in negotiations and made contacts relative to the possible sale of Redstone.

By a written representation dated November 1, 1962, Mr. Riffe stated to Wilshire that neither he nor any relative owned ten per cent or more of the stock of any company engaged in a similar line of business as Wilshire. At the time that this representation was made, the Redstone stock was owned by his daughters' trusts. Some time thereafter, and apparently in December 1962, the Redstone stock held by the trusts was sold to Inland, Inc. It appears that all

of the outstanding Redstone stock was sold at that time. The purchaser of this stock required as a condition of its purchase of the entire stock that there be a marketing contract whereby the Riffe Division would market the production of asphalt from the refinery formerly of Redstone.

Thereafter new schedules A were attached to the trusts of the Riffe children, and a bank became one of the trustees. This new schedule does not show ownership of the Redstone stock, but instead shows ownership of all or part of the purchase price therefor, together with other checks and property hereinafter discussed.

The trial court found that the trusts were irrevocable and were not under the control and direction of Mr. Riffe.

The record thus shows that the Redstone stock was stock in a competitive corporation. The record further shows that Mr. Riffe maintained contact with this competitive corporation and participated from time to time in negotiations concerning it. Had he owned this stock directly, there would be no question but what such ownership would constitute a violation of his employment contract and of his fiduciary position as an officer and director of Wilshire. The appellant urges that the fact that the stock was held in trust would make no difference because Mr. Riffe could not accomplish indirectly what he is prohibited from doing directly. Further the ownership of such stock by the trusts was contrary to the representations which he made on November 1, 1962, and was likewise contrary to the affidavit which he executed in May 1962.

The appellees on the other hand urge that the court found that the trusts were irrevocable, found that Mr. Riffe did not control the trusts, and that therefore there was no breach of contract or violation of fiduciary duty.

It appears that in an analysis of the duties of Mr. Riffe and the facts of this case, his obligations arising under his employment contract as they relate to participation in competitive corporations and his fiduciary duties as an officer and director are very much the same. The employment contract is perhaps made more specific by the subsequent affidavits and representations made by Mr. Riffe, thus the basic question presented is whether or not the fact that the trusts owned the shares of stock in Redstone insulated Mr. Riffe from liability under his employment contract or from any liability for breach of his fiduciary duties. There is no question but what the ownership of the Redstone stock by the trusts was not known by Wilshire, and in fact was so held contrary to the representations made by Mr. Riffe in November 1962.

■■ The courts have had many opportunities to consider the duties which are owed by an officer and director to a corporation as related to the personal interests of such an officer or of members of his family. There is no question that a person in the position of Mr. Riffe in this case, both under his contract and as an officer and director, owed a duty to Wilshire to act in the utmost good faith. As a director and officer of Wilshire he occupied a fiduciary position relative to the stockholders and the corporation. Dunnett v. Arn, 71 F.2d 912 (10th Cir.). A corporation is entitled to have its officers and directors actively promote its interests, and not to place themselves in a position where their personal interests conflict, or could conflict, with those of the corporation.

Mr. Riffe in his capacity as an officer of Wilshire, and as directed by a corporate decision, undertook to procure the release of the corporation from the contract with Cities Service. This was a difficult task, and was accomplished by inducing others to organize and substitute another company for Wilshire. These several business men organized Redstone for this purpose, and with some personal guarantees by Mr. Riffe, the desired result was accomplished. The personal involvement of Mr. Riffe, by way of his personal undertakings,

was of course beyond his obligations to the company, and there is no evidence that they were in any way contemplated by the company in its direction to secure a release.

Shares of stock in Redstone then were offered for sale at cost by one of its organizers, Mr. Murray, to Mr. Riffe but were refused by him because of his employment contract. The shares were then transferred instead to the trusts he had created about this same time for his children. The trial court found this transfer to have been made by Mr. Murray " * * * to express his appreciation to L. E. Riffe for affording A. V. Murray the opportunity to invest in Redstone * * *." The negotiation of the contract with Cities Service was done by Mr. Riffe as was Wilshire's release. All of this was clearly a corporate activity, and any benefits arising from it should not inure to the personal benefit of Mr. Riffe.

■ The record shows and the trial court found that Mr. Riffe rejected the offer of the stock to him directly because of his employment contract with Wilshire, yet there was accomplished indirectly what could not be done directly. The shares were transferred to the trusts for his children. These shares represented a personal benefit derived from a corporate transaction, and in view of the findings it is clear they were conferred on the trusts instead of on Mr. Riffe directly. This constituted a violation of his fiduciary duty as an officer and director to the corporation as well as a violation of his contract with it. The trial court was in error in its conclusions drawn from the findings of fact.

Certainly the duty of the director and officer here concerned can be no less than that of the employees considered by this court in Byer y. International· Paper Co., 314 F.2d 831 (10th Cir.), where it was held that the employee " * * * is bound to a high degree of good faith toward his employer, and is not entitled to avail himself of any advantage that his position may give him to profit at the employer's expense beyond the terms of the employment agreement." Nor is it less than that considered in Pratt v. Shell Petroleum Corp., 100 F.2d 833 (10th Cir.).

■ The basic principle applicable to the facts at hand is well stated in the following quotation:

"Since the directors and other officers of a corporation, whatever their relation may be technically, occupy a fiduciary or quasi trust relation toward the corporation and the stockholders collectively, it is thoroughly well settled that they cannot, either directly or indirectly, in their dealings on behalf of the corporation with others, or in any other transaction in which· they are under a duty to guard the interests of the corporation, make any profit, or acquire any other personal benefit or advantage, not also enjoyed by the other stockholders, * * *." 3 Fletcher Cyclopedia of Corporations 284 (perm. ed. 1965 rev. vol.).

In the above two quoted cases from this circuit, it was also held that no showing of damage to the corporation need be made when the facts demonstrate the creation of a situation which lent inducement or temptation for wrongdoing. Pratt v. Shell Petroleum Corp., supra; Byer v. International Paper Co., supra.

The element of secrecy is clearly present as the record shows that Wilshire did not know of the ownership of the Redstone stock by the trusts. In fact, the record shows that Mr. Riffe represented in writing to the corporation that none of his family owned directly or indirectly more than ten per cent of the shares of a competing company.

■ The trial court concluded that Mr. Riffe acted in good faith, but this does not affect his liability. Alvest, Inc. v. Superior Oil Corp., Alaska, 398 P.2d 213; 3 Fletcher Cyclopedia of Corporations § 888 (perm. ed., 1965 rev. vol.). Again the showing that he created a situation where his personal in-

terest came in conflict with that of the corporation was sufficient to show a breach of trust.

■ The trial court found these trusts to be irrevocable and not to be controlled by Mr. Riffe, but it is apparent that they were created at a critical time during the contract termination negotiations and the initial assets placed in them included the shares of stock in question and other assets also in issue here arising from the same transaction. Any increase in the assets of these trusts benefitted Mr. Riffe's family as a whole and benefitted him indirectly. He sought to accomplish by the trusts what he could not do directly. Thus assuming the trusts were valid they did not insulate him from liability for the breach of his fiduciary duty to the corporation. In Knox Glass Bottle Co. v. Underwood, 228 Miss. 699, 89 So.2d 799, the court considered facts somewhat similar to the ones before us except the legal principle concerned dealt with the corporation. The court there held liable the trustees of children of the officer-director for profits made in violation of fiduciary duties. The benefit inured to Mr. Riffe,' and no issue of a constructive trust to be imposed on the trust assets is here presented.

■■ We do not propose to treat at any length the burden which is placed upon a person in Mr. Riffe's position when the initial showing was made during the course of the trial that a possible breach of fiduciary duty had occurred. It is clear under these circumstances that an officer or director has the burden of fully explaining such a transaction and of showing its propriety. Geddes v. Anaconda Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425. The burden is certainly on the director or officer who buys property from the corporation to prove good faith in the sale, and its fairness to the corporation. Annot., 24 A.L.R.2d 89. The same rule must be applied to the situation presented here. Perlman v. Feldmann, 219 F.2d 173 (2d Cir.); Mattingly v. Sisler, 198 Okl. 107,

175 P.2d 796; Owens v. Musselman, 190 Okl. 199, 121 P.2d 998; Looney v. Chastain, Okl., 395 P.2d 571. No choice of law issue has been raised and there would seem to be no need to since the rule in its basic form appears to be universally applied.

As we have above indicated Redstone was competitive with Wilshire during at least a portion of the time in issue. This together with the undisputed ownership of thirty per cent of its stock by the Riffe trusts also constitutes a breach of the employment contract between Mr. Riffe and Wilshire.

*The Anco Commission:*

As indicated above there was also placed in the trusts money from Mr. Murray which was identified as one-half of the commission paid to Mr. Murray by Anco Manufacturing Company which built the asphalt plant for Redstone. This commission was known to Mr. Riffe, and the trial court found that this money was also offered to Mr. Riffe directly but he rejected it because of his contract with Wilshire. The court also found that this money was so offered by Mr. Murray to express his appreciation for the opportunity to invest in Redstone. The money was thereafter paid to the trusts created for the Riffe children.

■ This money falls in the same category as the stock in Redstone. It was a profit obtained out of a transaction with or in connection with a competitor. The trust schedule shows that this money was in payment for Mr. Riffe's guarantee of the Redstone bank loan. A memorandum of one of the trustees states it was money Mr. Murray had received on behalf of Mr. Riffe. It was treated by the payor for tax purposes as an expense. Thus the exact reason why the money was paid in to the trusts is not clear, but the record shows it inured to the benefit of Mr. Riffe without the knowledge of Wilshire and was a violation of his fiduciary duties. Mr. Riffe had the burden to demonstrate propriety and the fair-

ness of the transaction and he failed to do so.

*Universal Asphalt Company:*

Mr. Riffe invested, through his children's trusts, in Universal Asphalt Company, and took back an agreement whereby the trusts would receive a percentage of Universal's net profits. This corporation was owned by Mr. Thomas J. Masterson who was a salesman, apparently not full time, for Wilshire. Under his employment contract Mr. Masterson was permitted to operate this company engaged also in the sale of asphalt. He testified that the product he sold was not handled by Wilshire and that the two corporations were not competitive. The trial court weighed the evidence and apparently found there was no competition. It considered the fact that Wilshire had permitted Masterson to engage in the business, although under a somewhat different employment contract. The evidence was at best contradictory on the competition issue and the trial court's finding was supported by substantial evidence. This being the finding, it cannot be said that in this regard Mr. Riffe violated his employment contract nor violated his fiduciary duty.

The record shows that the Riffe Division paid what are referred to in the record as "commissions" to the wives of certain employees of Owens-Corning Fiberglass Company, in order to make sales of asphalt to that company. This arrangement apparently lasted about a year and a half. For each ton of asphalt purchased by Owens-Corning the record shows that the wives of certain of its officials received a commission. There is evidence however that these payments were made known to the then treasurer of Wilshire after having been noted in detail, including names and purpose, during the course of an audit. Since the payments were so known, the appellant cannot recover against the appellees.

The remaining issues pertaining to Mr. L. E. Riffe and the other appellees and the creation of Riffe Industries has been considered, but we cannot say that

the doctrine of "corporate opportunity," if this be a separate doctrine, is applicable, nor does the record support a cause of action based on ordinary trust or contract principles.

The case is reversed and remanded for further proceedings in accordance with this opinion.