**WILSHIRE OIL COMPANY OF TEXAS,**
**Appellant,**

v.

**L. E. RIFFE, O. Homer Riffe and Thomas**
**J. Masterson, Appellees.**

**No. 35-68.**

United States Court of Appeals
Tenth Circuit.

April 15, 1969.

Robert J. Woolsey, of Farmer, Woolsey, Flippo & Bailey, Tulsa, Okl. (Harry W. Colmery, of Colmery, Davis, Bennett, Leonard & McClure, Topeka, Kan., on the brief), for appellant.

John E. Shamberg, Kansas City, Kan., James R. Eagleton, Tulsa, Okl. (Charles S. Schnider and Jacob F. May, Jr., Kansas City, Kan., on the brief), for appellees O. Homer and L. E. Riffe.

Leo L. McCormick, of Downey, Sullivan, McCormick & Fitzgerald, Kansas City, Mo. (Larry Austin, of Wallace & Saunders, Overland Park, Kan., on the brief), for appellee Thomas J. Masterson.

Before MURRAH, Chief Judge, and HILL and SETH, United States Circuit Judges.

HILL, Circuit Judge.

This action for damages was filed in the United States District Court for the District of Kansas by the appellant, Wilshire Oil Company of Texas, a Delaware corporation, against its former employ-

ees, L. E. Riffe and O. Homer Riffe, citizens of Oklahoma, and Thomas J. Masterson, a citizen of Kansas. The appellant seeks to recover certain fines, penalties and other expenditures it has incurred or will incur as the result of its involvement in various state and federal antitrust violations.

Jurisdiction being based upon diversity, and process having been served upon the Riffes in Oklahoma, their motion to dismiss the complaint for lack of personal jurisdiction was sustained because of the failure to meet the requirements of the Kansas long-arm statute.[1] A similar motion to dismiss as to Masterson was granted on the ground that the complaint failed to state a claim i. e., antitrust fines and penalties cannot be recouped by a corporate violator from its employees. This appeal challenges the propriety of those rulings.

As the result of a merger consummated on December 31, 1960, Wilshire obtained the Riffe Petroleum Company, an Oklahoma corporation formerly owned by its president, L. E. Riffe.[2] Following the merger, the corporation became an unincorporated division of Wilshire with its management and employees continuing essentially as before. L. E. Riffe, having become a vice president and director of Wilshire, was placed in charge of the new division. Thomas Masterson and Homer Riffe, brother of L. E. Riffe, continued in their capacity as asphalt salesmen in the States of Kansas and Missouri, respectively.

Thereafter, and pursuant to indictments returned in the federal district courts of Missouri and Kansas, Wilshire

was charged with violating the federal antitrust laws in that from December 31, 1960, until about August 9, 1963, its Riffe Division conspired to fix the price of asphalt sold to the States of Kansas and Missouri. Wilshire pleaded *nolo contendere* in the Missouri court and was tried and convicted in the Kansas district court. In addition, a civil action by the State of Missouri involving the same conduct was settled out of court and a similar civil suit brought by the State of Kansas is still pending.

Wilshire contends that its payment of, and contingent liability for the payment of, certain sums as criminal fines, civil damages, settlements, expenses and attorneys' fees in the aforementioned suits, is due solely to the unauthorized activity of the three appellees and that it is therefore entitled to recover from them all of the amounts it has expended or may be required to expend as a result of their "faithless conduct."[3] To this end it was alleged in counts one and two of the complaint that all three appellees participated in the Missouri conspiracy and were thus liable for the expenses absorbed by Wilshire in connection with the civil and criminal litigation in that state. As to the fines and other sums expended with regard to the Kansas conspiracy, counts three, four and five sought indemnification from Masterson and L. E. Riffe but did not seek to recover from Homer Riffe.

The first issue presented for our consideration requires a review of the trial court's determination that it lacked *in personam* jurisdiction over the Riffes because they did not have sufficient contacts with the forum state to satisfy the

---

1. In diversity suits it is now well established that a federal court can obtain personal jurisdiction over nonresidents by complying with the long-arm statute of the state in which it sits. Rule 4(d) (7) and (e), F.R.Civ.P.; 2 Moore's Federal Practice ¶ 4.41 p. 1291 (2d ed. 1967).

2. Many of the essential facts are set forth in Wilshire Oil Company of Texas v. Riffe, 381 F.2d 646 (10th Cir. 1967), cert. den. 389 U.S. 822, 88 S.Ct. 50, 19 L.Ed.2d 75.

3. The total amount of damages sought is approximately $563,116.00. This consists of a $10,000 fine paid in the Missouri district court; $11,900 in "damages" and $4,727 in attorneys' fees paid to settle the suit by the State of Missouri; a potential $50,000 fine in the Kansas district court and $26,648 in legal fees and expenses; and a potential $441,630 in damages and $18,211 in legal fees and expenses in connection with the suit by the State of Kansas.

Kansas long-arm statute. It is conceded that the only basis for personal jurisdiction is the long-arm statute which provides, in pertinent part, for service of process upon nonresidents who transact "any business," commit "a tortious act," or own, use or possess "any real estate" within the state.[4] The statute further provides that in suits in which jurisdiction is based thereon, "only causes of action arising from acts enumerated [therein] may be asserted against a defendant * * *." Accordingly, any attempt to ascertain the applicability of the statute must necessarily resolve two questions: (1) did the defendant transact any business, commit a tortious act, or own, use or possess any realty within the state; and (2) does the cause of action that is the basis of the suit arise from the performance of any of those activities? National Bank of America at Salina v. Calhoun, 253 F.Supp. 346, 349 (D.Kan.1966).

In answering the first of these two questions, the "minimum contacts test" of International Shoe and its progeny[5] come to the fore. This is a result of the fact that even though International Shoe was concerned with whether nonresident personal service satisfied the requirements of due process, " 'essentially the same factors which enter into a determination that * * * [the long-arm statute] authorizes the exercise of jurisdiction are involved in deciding whether the exercise of jurisdiction is constitutionally valid.' " Woodring v. Hall, 200 Kan. 597, 438 P.2d 135, 141 (1968). Hence, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

It was demonstrated on the basis of the uncontradicted allegations in the complaint, certain affidavits, and other documents submitted on the question of jurisdiction,[6] that the Riffes conducted the following activities within the forum state. Homer Riffe, in his capacity as an employee of Wilshire, attended maintenance lettings in Topeka, Kansas, during the year 1962, and as an officer of Riffe Petroleum Company (not to be confused with the Riffe Division of Wilshire), submitted a signed bid form to the State of Kansas in 1964. L. E. Riffe signed several bid forms submitted to the State of Kansas between the years 1962 and 1967. Some of the forms were executed by him in his capacity as an officer of Wilshire, while others were submitted on behalf of a corporation organized in September, 1963, to wit: the Riffe Petroleum Company. L. E. Riffe also owned an interest in the Reserve Pipe Line Company which transported oil to the Century Refining Company which, in turn, was the Kansas manufacturer of the asphalt Wilshire sold in that state. Finally, L. E. Riffe loaned a substantial sum of money to Thomas Masterson. This money was purportedly used to finance the latter's conspiratorial acts in the State of Missouri.

The foregoing activities were, for the most part, conducted by Homer Riffe and L. E. Riffe in their capacity as

---

4. K.S.A. § 60–308. It is obvious that in determining the propriety of service of process under the long-arm statute, state law rather than federal law is controlling. Walker v. General Features Corp., 319 F.2d 583 (10th Cir. 1963).

5. International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ; Perkins v. Benguet Consol. Min. Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952) ; McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) ; and Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

6. In view of the complexity of the activities upon which the issue of jurisdiction rests, the holding of a hearing would have provided a more satisfactory basis for decision. See United States v. Montreal Trust Co., 35 F.R.D. 216 (S.D.N.Y.1964), and United States v. Montreal Trust Co., 235 F.Supp. 345 (S.D.N.Y.1964) rev'd on other grounds, 358 F.2d 239 (2d Cir. 1966).

agents and employees of Wilshire. This led the district court to conclude that these agents, in performing these acts for their corporate principal, did not thereby render themselves personally amenable to service of process under the Kansas statute, i.e., they were not individually transacting business in Kansas in the sense specified in the statute. The court found with respect to the other alleged minimum contacts, that the contacts either did not take place within the forum, or if they did, they did not give rise to the cause of action asserted. We agree with this conclusion of the district court.

When Homer Riffe attended the maintenance lettings [7] in Kansas, he was there merely to represent his employer. There has been nothing to indicate that his attendance at those meetings related to Wilshire's cause of action against him for his participation in the Missouri price-fixing conspiracy. Admittedly, the Kansas maintenance lettings may have been indicative of conspiratorial activity in Kansas. Wilshire has not, however, sought to charge Homer Riffe with liability for its Kansas expenditures. We therefore conclude that the cause of action against Homer Riffe did not arise out of these contacts which cannot provide a basis for the exercise of personal jurisdiction.

With regard to the 1964 bid signed by Homer Riffe as an officer of Riffe Petroleum Company, it is difficult to envision the relationship of that act to Wilshire's claim which is based upon activity occurring during the years 1961 through 1963. Additionally, there has been no showing that Wilshire was in any way involved with this bid submitted by the Riffe Petroleum Company. Furthermore, the signing of the bid form, and for that matter the attendance at the various maintenance lettings, were the acts of Homer Riffe as a corporate employee. As such they were not his personal acts and seemingly cannot constitute the transaction of business by Homer Riffe as an individual.[8] Yet introduction of the fact that it is alleged that the acts were perpetrated in violation of the agent's fiduciary duty, militates against the utilization of this fiduciary shield.[9] In any event, it is clear that Wilshire has failed to prove a sufficient nexus between the submission of the bid and its claim against Homer Riffe. Consequently, the district court correctly declined to exercise *in personam* jurisdiction over Homer Riffe.

As to the appellee, L. E. Riffe, it was shown that he owns, in his individual capacity, an interest in a pipeline company which operates within Kansas.[10] This pipeline transported oil to the Century Refining Company which manufactured the asphalt purchased by Wilshire for later sale to the State of

7. Maintenance lettings are meetings in which state officials formally announce the winners of bids submitted for state contracts.

8. It has been held that while a foreign corporation is amenable to service when it transacts business through agents operating in the forum state, unless the agents transact business on their own account and not on behalf of the corporation, the agents are not engaged in business so as to sustain an application of the long-arm statute to them as individuals. Boas & Associates v. Vernier, 22 A.D.2d 561, 257 N.Y.S.2d 487 (1st Dept.1965) ; Schenin v. Micro Copper Corp., 272 F.Supp. 523 (S.D.N.Y.1967) ; Unicon Management Corp. v. Koppers Co., 250 F.Supp. 850 (S.D.N.Y.1966) ; Willner v. Thompson, 285 F.Supp. 394 (E.D.N.Y.1968). Eis-

man v. Martin, 174 Kan. 726, 258 P.2d 296 (1953), cited by appellant involved an application of a nonresident motorist statute to a negligence action predicated upon an agent's faulty driving. The court merely determined that the statute was not restricted to situations where a defendant was driving his own vehicle. The case is thus inapposite.

9. United States v. Montreal Trust Co., 385 F.2d 239 (2d Cir. 1966) ; Krause v. Hauser, 272 F.Supp. 549 (E.D.N.Y. 1967) ; Maternity Trousseau, Inc. v. Maternity Mart of Baltimore, 196 F.Supp. 456 (D.Md.1961).

10. This it is urged, not only constitutes the transaction of business, but also involves the ownership and use of real estate as specified in the Kansas statute.

Kansas. Assuming that this is a sufficient contact to vindicate the exercise of personal jurisdiction,[11] it is hard to understand how Wilshire's claim against L. E. Riffe arises from the activity engaged in by the pipeline company. Wilshire points to the fact that its action is based upon the sale of asphalt and the pipeline is a supplier of the basic ingredient. Yet this explanation falls short of indicating a causal connection between ownership of the pipeline and participation in the asphalt conspiracy. The right of Wilshire to recover its antitrust damages has simply not been shown to relate in any way to the operation of the pipeline within the state.

■ Alternatively, Wilshire points to the fact that L. E. Riffe loaned money to Masterson which the latter used to finance the operations of his Universal Asphalt Company.[12] Universal Asphalt Company was involved in the Missouri conspiracy, thus it is asserted that because the loan was undertaken in Kansas, the claim against L. E. Riffe arises from this contact with the forum state. Again, we are not convinced that the action against L. E. Riffe can be said to arise from this loan of money to Masterson. Wilshire, as the party invoking the jurisdiction of the court, has the burden of pleading and proving the existence of jurisdiction.[13] The bold assertion that the loaning of money to a company involved in a conspiracy there-

by connects the creditor with that conspiracy is not persuasive. The fact that the creditor may have been connected in some other way with the conspiracy does not bridge the gap of causal connection between that particular contact with the forum and the otherwise unrelated claim against the creditor.

■■ Finally, it is argued that the signing of the bid forms submitted by Wilshire to the State of Kansas, constitutes the transacting of business within the forum state. As indicated by the district court, when L. E. Riffe signed the form as an officer of Wilshire, he was performing a purely ministerial function in his capacity as a corporate agent. The terms and conditions of the bids were prepared by other corporate employees. The signature of an officer of the company was affixed solely to conform to the requirements of the bid recipient. Thus, our previous discussion of the fiduciary shield precluding an exercise of personal jurisdiction over a corporate agent applies with equal force here. Nonetheless, we do not deem it necessary to decide the matter solely on that basis. The interaction of the inherent weakness of the contacts and the strained causal connection with the underlying cause of action, operates in conjunction with the fact of the agency relationship to require, in conformity with notions of fair play and substantial justice,[14] that this court refrain from com-

11. There is certainly room to question the assertion of jurisdiction over an individual merely because he owns stock in a corporation transacting business within the state.

12. This arrangement is discussed in Wilshire Oil Company of Texas v. Riffe, 381 F.2d 646, 653 (10th Cir. 1967), cert. den. 389 U.S. 822, 88 S.Ct. 50.

13. Tetco Metal Products, Inc. v. Langham, 387 F.2d 721 (5th Cir. 1968); Taylor v. Portland Paramount Corp., 383 F.2d 634 (9th Cir. 1967); Unicon Management Corp. v. Koppers Co., 250 F.Supp. 850 S.D.N.Y.1966).

14. Throughout our discussion of the various contacts relied upon by Wilshire,

there has been no attempt to relate the issues presented here with the specific fact situations presented in other cases dealing with long-arm statutes. While the underlying reasoning of related cases is helpful, "it cannot be stated with exactitude what constitutes the 'transaction of any business,' but it may be stated that each case must turn on its own fact pattern." Woodring v. Hall, 200 Kan. 597, 438 P.2d 135, 144 (1968). Our task is to determine whether in each instance the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." Tilley v. Keller Truck and Implement Corp., 200 Kan. 641, 438 P.2d 128 (1968).

pelling a corporate officer to answer in courts located in a state foreign to both the agent and his corporation.[15]

Coming then to consider the contention that the district court incorrectly sustained the motion to dismiss as to appellee Masterson, it is first appropriate to determine the correct law to be applied. Because this is a diversity action, this court must apply the conflict of laws principles of the forum State of Kansas. Haury v. Allstate Ins. Co., 384 F.2d 32 (10th Cir. 1967). Having found nothing to the contrary, we conclude that Kansas would follow the traditional rule and look to the state of incorporation, Delaware.[16] The liability asserted against Masterson as an employee of a foreign corporation is based upon the theory that his unauthorized violation of the antitrust laws constitutes a violation of the fiduciary duty owed to the corporation. As such, this is a claim involving the internal affairs of a foreign corporation and clearly justifies the utilization of the concomitant choice-of-law rule.

The district court predicated the dismissal of the complaint upon the ground that it would violate general public policy and frustrate the purpose of the antitrust laws to allow a corporation to recoup criminal fines imposed for violations of those laws. That disposition of the matter was incomplete. Wilshire seeks indemnification not only for criminal penalties but also for civil damages and related litigation expenses. Hence, although it may be proper to dismiss the complaint when it is clear that legally cognizable damages cannot be shown, it is still necessary to examine each separate element of the total damages sought before deciding that the claim has failed.

Taking first the $10,000 fine paid after a plea of *nolo contendere* in the federal district court of Missouri, we cannot agree that recovery of that amount should be denied to the corporation in this situation. The public policy against allowing a claim premised upon the wrongful conduct of the claimant is of ancient origin, akin to the "unclean hands doctrine" in equity. It has been invoked, *inter alia*, to preclude a suit based on a contract violative of the antitrust laws, Continental Wall Paper Co. v. Louis Voight & Sons Co., 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 (1909); to defeat an action upon a constructive trust arising from an illegal pooling arrangement, Warner Bros. Theatres v. Cooper Foundation, 189 F.2d 825 (10th Cir. 1951); and to deny a claim for losses suffered in a check kiting operation, Falconi v. F. D. I. C., 257 F. 2d 287 (3d Cir. 1958). Stated generally, the rule is that "where the plaintiff's conduct in connection with the transaction upon which his claim is based was illegal and criminal the courts will deny him relief." 257 F.2d at 291. It is apparent that the principle can have no application in the case at bar. Here the criminal liability of the corporation is purely vicarious. It results solely from the activity of the corporate employees. To allow those employees to assert that their own unlawful conduct operates to defeat the right of their corporation to recover for the injury caused by that same conduct, is an exercise in circuitous reasoning. See Restatement (Second), Agency § 401, comment *d* (1958).

---

15. It is also urged that this conduct amounted to the commission of a tortious act within the state. Our discussion of whether this conduct constituted the transaction of business sufficient to warrant an assertion of jurisdiction is also relevant to this contention. In either situation the pertinent consideration is whether the contact is one which is substantial enough to provide a sound basis for compelling the appellee to defend against the specific claim asserted.

16. "Beneficial is a Delaware corporation. The law of Delaware is, of course, determinative of the liability of the officers and directors to the corporation and that of the corporation to its officers." Beneficial Indus. Loan Corp. v. Smith, 170 F.2d 44, 50 (3d Cir. 1948), aff'd, Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); Hausman v. Buckley, 299 F.2d 696, 703, 93 A.L.R.2d 1340 (2d Cir. 1962); Upson v. Otis, 155 F.2d 606, 610 (2d Cir. 1946).

In disposing of the contention that to allow this action would frustrate the policy underlying the antitrust laws, the alternative ground relied upon by the trial court, it is essential to appreciate the specific theory upon which this claim is based. The liability of the employee is premised upon a breach of the fiduciary duty owed to the corporation. The fact that this breach of duty is sought to be demonstrated by referring to an antitrust violation does not operate to convert the suit into one arising under the antitrust laws. Meyer v. Kansas City So. Ry. Co., 84 F.2d 411 (2d Cir. 1936) cert. den. 299 U.S. 607, 57 S.Ct. 233, 81 L.Ed. 448. Thus even assuming that the remedies provided by the antitrust laws for enforcing the rights created therein are exclusive, it does not preclude this action. Wilshire is not seeking to enforce a right created by those statutes. On the contrary, Wilshire is merely attempting to redress an injury which was inflicted as a result of an effort on the part of certain of its employees to commit a public wrong. There is therefore no occasion to gauge appellant's remedial rights by the statutory penalties either in the sense of being concerned with treble damages or with the exclusivity or preemption of those rights by the antitrust laws.[17] It follows that the fact that antitrust remedies have been provided by statute does not deprive Wilshire of its traditional common law right to recover for injuries occasioned by errant employees.

Wilshire's attempt to recoup the $11,900 paid to the State of Missouri presents difficulties of a different nature. When the allegations of the complaint relating to the Missouri settlement are contrasted with the contents of the Covenant Not To Sue, the latter constituting the tangible evidence indicating the circumstances in which the settlement was made, an inconsistency appears. Although it is alleged that the money was paid as damages in settlement of a civil suit, the covenant states that payment was "received solely as an adjustment of the aggregate purchase price paid by Covenantor for asphaltic products manufactured or sold by Covenantee [Wilshire] and *not as damages*." [Emphasis supplied.] Thus, the contention is made that Wilshire cannot now claim the payment as damages, and certainly cannot do so against Masterson who had no connection with the Missouri conspiracy.

It is, of course, elementary that on a motion to dismiss the allegations of the complaint and all supporting affidavits are accepted as true. Gardner v. Toilet Goods Ass'n, Inc., 387 U.S. 167, 172, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). Accordingly, the matter is not before us in the proper posture required to definitively determine whether this particular item of damages will stand the test of causation.[18] With regard to the fact that the averments in the complaint seem to be contradicted by the formal language of the Covenant Not To Sue, it must be remembered that the archaic pleading technicalities of the past have not survived in the federal courts. A complaint may be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Because it would be open to Wilshire to go beyond the language of the covenant in order to demonstrate that the sum expended was nonetheless caused by the employees' unlawful conduct, a dismissal of that part of the complaint is inappropriate.

In resisting Wilshire's attempt to recover attorneys' fees incurred in connection with the aforementioned antitrust litigation, Masterson points to the

---

17. Hand v. Kansas City So. Ry. Co., 55 F.2d 712, 714 (S.D.N.Y.1931); Guiterman v. Pennsylvania R. Co., 48 F.2d 851 (E.D.N.Y.1931); Clayton v. Farish, 191 Misc. 136, 73 N.Y.S.2d 727, 745 (Sup.Ct. 1947).

18. It was alleged that Masterson participated in the Missouri antitrust violations. This allegation cannot be challenged at this time.

well established rule that in the absence of any contractual or statutory liability therefor, counsel fees and related expenses are not recoverable as an element of damages. There can be no quarrel with that general rule in those instances where fees and expenses incurred in prosecuting a suit are sought to be recovered in that same suit. Similarly, the rule appears to be generally accepted in cases where an attempt is made to recoup the expenses absorbed in a previous suit between the same party litigants. Nevertheless, where a party was involved in previous litigation with others because of some wrongful act of the defendant, reasonable compensation for expenses attributable to the former suit is recoverable where such expenses are the natural consequences of the defendant's wrongful act.[19] Clearly then there appears little reason to distinguish counsel fees from the other financial outlays suffered by Wilshire as a result of its involvement in antitrust litigation.

With regard to the criminal and civil suits arising from the price-fixing activity in Kansas, it is alleged that Wilshire may be required to pay a fine in the amount of $50,000, may be required to respond in damages in excess of $400,000, and may be required to expend additional sums as litigation expenses. The damages as thus alleged reflect that they do not amount to present and existing damages, but are merely anticipated and conclusory. Absent an allegation that the suits in Kansas have been finally concluded and an award assessed against Wilshire, the damages are remote and speculative, a matter of pure guesswork, and cannot presently be considered.[20] In short, the inclusion of such damages in the complaint is premature until such time as Wilshire's obligation and resultant loss has definitely been established.

What has been said up to this point adequately responds to the narrow basis relied upon by the district court in improvidently granting the motion to dismiss. It is quite clear, however, that there would be no need to belabor each distinct item of damage unless the basic theory of Wilshire's claim, the existence of employee liability, can be said to provide a legal basis for requiring Masterson to respond for those damages. There thus remains for consideration the question of whether Wilshire's claim is so novel and ill conceived as to warrant a dismissal upon that basis alone.

To reiterate, Wilshire is here attempting to invoke the law of fiduciary duty in order to affix liability upon employees whose antitrust violations have subjected the corporation to civil and criminal liability. This type of contest between corporation and employee is unusual because generally the wrongdoing employees also possess a control over the corporation that allows them to suppress any attempt to rectify the wrong done. Koster v. (American) Lumbermen's Mutual Cas. Co., 330 U.S. 518, 522, 67 S.Ct. 828, 91 L.Ed. 1067 (1947). Accordingly, the corporate loss is traditionally remedied in these situations through the employment of the device of a stockholder's derivative action. But the right asserted in such action belongs to the corporation, with the result that derivative suits involving these same issues are clearly analogous here. 330 U.S. at 522, 67 S.Ct. 828; 13 Fletcher, Cyclopedia of Corporations § 5939 (1961).

Graham v. Allis-Chalmers Mfg. Co., 40 Del.Ch. 335, 182 A.2d 328 (1962), aff'd, 41 Del.Ch. 78, 188 A.2d 125 (1963),

19. Safway Rental & Sales Co. v. Albina Engine & Machine Works, Inc., 343 F.2d 129 (10th Cir. 1965); Chittim v. Texas Pac. Coal & Oil Co., 317 F.2d 81 (10th Cir. 1963). See generally, Annot., 45 A.L.R.2d 1183 (1956) and Annot., 4 A.L.R.3d 270 (1965).

20. Borden v. Cohen, 231 N.Y.S.2d 902 (Sup.Ct.1962). *Cf.* T. F. Scholes, Inc. v. United States for Use of H. W. Moore Equipment Co., 295 F.2d 366 (10th Cir. 1961); Delaware, for Use of General Crushed Stone Co. v. Massachusetts Bonding & Ins. Co., 49 F.Supp. 467 (D. Del.1943). Certain attorneys' fees and connected expenses have already been expended and are not subject to this criticism.

was one such derivative suit that indicates that the Delaware courts would allow this action between a corporation and its employees. There the court was faced with a suit against director and non-director employees based upon their failure to discover that other employees were violating the antitrust laws. The damages as alleged consisted of fines and penalties, possible treble damage judgments, and injury to the corporate reputation. In dismissing the complaint because of an absence of evidence to indicate that the defendants knew or should have known of the price-fixing, the court implicitly recognized the right of the corporation to recover for injury caused by employee participation in antitrust violations. In a similar vein the New York court in Simon v. Socony-Vacuum Oil Co.,[21] dismissed the complaint because the employees had not acted fraudulently, corruptly or in bad faith. The court noted that the defendants would be held personally liable if they knew or had reason to know that their conduct violated the antitrust provisions. Other New York decisions have likewise recognized that a cause of action can be predicated

upon a breach of fiduciary duty occurring upon a violation of the antitrust laws,[22] but have had difficulty determining the kind of damages that must be shown, whether the benefit to the corporation offsets its injury,[23] and the like.[24]

A resolution of all of the incidental problems that may arise cannot be made until such time as the particular problem is directly before the court. As we have indicated, this case is before us on a motion to dismiss, we merely conclude that it cannot be said that it is beyond doubt that Wilshire can prove no set of facts in support of this claim. We cannot and do not attempt to anticipate or preclude any defense that may be raised as the facts begin to unfold at a later stage of the proceedings.

The dismissal of the action by the trial court as to the appellees, O. Homer Riffe and L. E. Riffe, for want of jurisdiction over the parties, is affirmed. The dismissal of the action against appellee, Masterson, for failure to state a cause of action is set aside and the case is remanded for further proceedings consistent herewith.

21. 179 Misc. 202, 38 N.Y.S.2d 270 (Sup. Ct.1942), aff'd mem., 267 App.Div. 890, 47 N.Y.S.2d 589 (1st Dept. 1944).

22. "If that wrongful act has the additional vice of violating the Federal Anti-Trust Laws as the result of which Standard [the corporation] is required to forfeit its rights to royalties which could otherwise be collected or to pay damages or fines, those losses to Standard are the direct result of defendants' [corporate employees] acts which this court may redress. Any other conclusion would leave Standard remediless for these losses caused by defendants' wrongful acts * * *." Clayton v. Farish, 191 Misc. 136, 154, 73 N.Y.S.2d 727, 745 (Sup.Ct.1947). The court went on to point out that the mere violation of the antitrust laws is not

enough unless that violation can be said to breach the employees' fiduciary duty.

23. Borden v. Cohen, 231 N.Y.S.2d 902 (Sup.Ct.1962).

24. Knopfler v. Bohen, 15 A.D.2d 922, 225 N.Y.S.2d 609 (2d Dept. 1962); Smiles v. Elfred, 149 N.Y.L.J. 14 col. 6 (N.Y. Sup.Ct.1963); Premselaar v. Chenery, Civil No. 6151, N.Y.Sup.Ct., N.Y. County, Feb. 13, 1963; Spinella v. Heights Ice Corp., 186 Misc. 996, 62 N.Y.S.2d 263 (Sup.Ct.1946). See generally, Forte, Liabilities of Corporate Officers for Violations of Fiduciary Duties Concerning the Antitrust Laws, 40 Indiana L.J. 313 (1965); Comment, 59 Michigan L.R. 904 (1961).